O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JAMES NUNEZ,                         ) Case No. CV 11-10219-JPR
                                     )
              Plaintiff,             )
                                     )
         vs.                         ) MEMORANDUM OPINION AND ORDER
                                     ) AFFIRMING THE COMMISSIONER
MICHAEL J. ASTRUE,                   )
Commissioner of the Social          )
Security Administration,            )
                                     )
              Defendant.             )
                                     )

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Supplemental Security Income ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed September 28, 2012, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

## II.  BACKGROUND

Plaintiff was born on November 17, 1969.  (Administrative

1

Record ("AR") 173.)  He has a high school education and is able to communicate in English.  (AR 38.)  Plaintiff worked beginning in approximately 1985 as a parts clerk and delivery-route driver. (AR 67, 178.)  He stopped working sometime between 2005 and 2008.[1]  (See AR 39-40, 578, 743.)  On March 12, 2008, Plaintiff filed an application for SSI, alleging a disability onset date of February 1, 2007.[2]  (AR 168-74, 182.)  The application was initially denied on April 18, 2008 (AR 81), and again upon reconsideration on August 29, 2008 (AR 88).[3]

After Plaintiff's application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"); an initial hearing was held on August 19, 2009, during which the ALJ found that the record was not sufficiently developed and ordered that further evidence be obtained.  (AR 33-34.)  A full hearing was

---

[1]Plaintiff testified that he stopped working in March 2005, when he was diagnosed with lupus (AR 39-40), but there is evidence in the record that he continued to work until at least December 2007, when he was hospitalized with complications from lupus and had a stroke (see AR 743), and possibly all the way until September 2008 (see AR 578 (September 18, 2008 treatment notes noting doctor is "having the nurse try to contact [Plaintiff] at work"); see also AR 480 (June 5, 2008 treatment notes noting Plaintiff "is having some return of dermatitis with increasing sun exposure during the day and travels to and from work when he started work again")).

[2]Plaintiff's Disability Report states that the alleged onset date is "December 1, 1999."  (AR 182.)  The interview notes further state that "Claimant has been disabled however the doctors could not diagnose him until 2005" and "[h]e last worked in 1999 due to his disability he could no longer work."  (AR 185.)  As discussed below, it is unclear when, or if, Plaintiff actually stopped working.

[3]Plaintiff also applied for Disability Insurance Benefits on March 12, 2008.  (AR 173-74.)  He has not appealed any denial of those benefits to this Court.  (See generally Compl., J. Stip.)

2

1   held on December 17, 2009, at which Plaintiff, who was

2   represented by counsel, appeared and testified on his own behalf.

3   (AR 37-56.)  Medical Expert ("ME") Steven Gerber, M.D., and

4   Vocational Expert ("VE") Gail Maron also testified.  (AR 56-72.)

5   In a written decision issued on July 19, 2010, the ALJ determined

6   that Plaintiff was not disabled.  (AR 14-24.)  Plaintiff then

7   requested review of the ALJ's decision, and on October 20, 2011,

8   the Appeals Council denied review.  (AR 1-5.)  This action

9   followed.

10 **III. STANDARD OF REVIEW**

11      Pursuant to 42 U.S.C. § 405(g), a district court may review

12   the Commissioner's decision to deny benefits.  The ALJ's findings

13   and decision should be upheld if they are free from legal error

14   and are supported by substantial evidence based on the record as

15   a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91

16   S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481

17   F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such

18   evidence as a reasonable person might accept as adequate to

19   support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter

20   v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

21   a scintilla but less than a preponderance.  Lingenfelter, 504

22   F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,

23   882 (9th Cir. 2006)).  To determine whether substantial evidence

24   supports a finding, the reviewing court "must review the

25   administrative record as a whole, weighing both the evidence that

26   supports and the evidence that detracts from the Commissioner's

27   conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

28   1996).  "If the evidence can reasonably support either affirming

1  or reversing," the reviewing court "may not substitute its

2  judgment" for that of the Commissioner.  Id. at 720-21.

3  **IV.  THE EVALUATION OF DISABILITY**

4       People are "disabled" for purposes of receiving Social

5  Security benefits if they are unable to engage in any substantial

6  gainful activity owing to a physical or mental impairment that is

7  expected to result in death or which has lasted, or is expected

8  to last, for a continuous period of at least 12 months.  42

9  U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

10 (9th Cir. 1992).

11       A.   The Five-Step Evaluation Process

12       The ALJ follows a five-step sequential evaluation process in

13 assessing whether a claimant is disabled.  20 C.F.R.

14 § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.

15 1995) (as amended Apr. 9, 1996).  In the first step, the

16 Commissioner must determine whether the claimant is currently

17 engaged in substantial gainful activity; if so, the claimant is

18 not disabled and the claim must be denied.  § 416.920(a)(4)(i).

19 If the claimant is not engaged in substantial gainful activity,

20 the second step requires the Commissioner to determine whether

21 the claimant has a "severe" impairment or combination of

22 impairments significantly limiting his ability to do basic work

23 activities; if not, a finding of not disabled is made and the

24 claim must be denied.  § 416.920(a)(4)(ii).  If the claimant has

25 a "severe" impairment or combination of impairments, the third

26 step requires the Commissioner to determine whether the

27 impairment or combination of impairments meets or equals an

28 impairment in the Listing of Impairments ("Listing") set forth at

20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform his past work; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(iv).  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

        B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since March 12, 2008, the date of his SSI application.  (AR 16.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of "systemic lupus erythematosis in remission, chronic hypertension, status-post cardiovascular accident, obesity, and a mood disorder associated

---

     [4]RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

with a general medical condition." (AR 17 (citations omitted).)
He also found that Plaintiff claimed to have the additional
impairments of "autoimmune hepatitis, polyneuropathy, and
fatigue," but there was insufficient evidence in the record
showing that those impairments caused significant limitations on
Plaintiff's ability to perform basic work activities.[5] (Id.) At
step three, the ALJ determined that Plaintiff's impairments did
not meet or equal any of the impairments in the Listing. (AR 17-
19.) At step four, the ALJ found that Plaintiff retained the RFC
to perform "light work"[6] with the limitations that Plaintiff
"cannot have prolonged exposure to sunlight, he is limited to
simple, routine, repetitive tasks, he can have only occasional
contact with co-workers, supervisors, or the public, and he have
[sic] only occasional changes in his work environment." (AR 19.)
Based on the VE's testimony, the ALJ concluded that Plaintiff was
not able to perform his past relevant work as a parts clerk or
delivery-route driver. (AR 23.) At step five, the ALJ found

_____

[5]In the ALJ's opinion, the two sentences directly following
his findings that insufficient evidence supported Plaintiff's
claims of hepatitis, polyneuropathy, and fatigue state, "The
above listed physical and mental impairments cause the claimant
significant limitations in her ability to perform basic work
activities. I therefore find that the impairments are severe."
(AR 17.) These sentences, which do not logically follow from the
statement directly before them and which incorrectly refer to
Plaintiff as "her," appear to result from transcription error.

[6]"Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
10 pounds," a "good deal of walking or standing" or sitting,
"with some pushing and pulling of arm or leg controls." 20
C.F.R. § 416.967(b). A person capable of performing light work
is also capable of performing sedentary work, as defined in
§ 416.967(a). Id.

1  that jobs existed in significant numbers in the national economy
2  that Plaintiff could perform.  (Id.)  The ALJ agreed with the VE
3  that Plaintiff could perform the jobs of housekeeping cleaner,
4  inspector hand packager, and blind-stitch sewing-machine
5  operator.  (AR 24.)  Accordingly, the ALJ determined that
6  Plaintiff was not disabled.  (Id.)

7  **V.   DISCUSSION**

8       Plaintiff alleges that the ALJ erred in (1) evaluating the
9  opinions of Plaintiff's treating physicians; (2) evaluating
10 Plaintiff's mental impairments; and (3) finding Plaintiff's
11 subjective symptom testimony not credible.  (J. Stip. at 3.)[7]

12      A.   The ALJ Did Not Err in His Consideration of the
13           Opinions of Plaintiff's Treating Physicians

14      Plaintiff contends that the ALJ did not properly evaluate
15 rheumatologist Dr. Paul Sussman's RFC analysis and treating notes
16 or the treating notes of Plaintiff's other rheumatologists at the
17 Facey Medical Group, all of which allegedly showed that Plaintiff
18 had several additional severe impairments that prevented him from
19 working.  (J. Stip. at 5-8, 18-21.)  Reversal is not warranted on
20 this basis because the ALJ gave clear and convincing reasons for
21 rejecting the opinions at issue, and the ALJ's evaluation of the
22 medical evidence was consistent with substantial evidence in the
23 record.

24           1.   Applicable law

25      Three types of physicians may offer opinions in social

26 ─────────────────────

27       [7]In the Joint Stipulation, the first and second issues are
   addressed together.  For clarity, the Court addresses them
28 separately.

7

security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended Apr. 9, 1996).  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  The weight given a treating physician's opinion depends on whether it was supported by sufficient medical data and was consistent with other evidence in the record.  See 20 C.F.R. § 416.927(c)(2).  If a treating physician's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight and rejected only for "clear and convincing" reasons.  See Lester, 81 F.3d at 830; § 416.927(c)(2).  When a treating physician's opinion conflicts with other medical evidence or was not supported by clinical or laboratory findings, the ALJ must provide only "specific and legitimate reasons" for discounting that doctor's opinion.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  Factors relevant

8

to the evaluation of a treating physician's opinion include the "[l]ength of the treatment relationship and the frequency of examination" as well as the "[n]ature and extent of the treatment relationship" between the patient and the physician. § 416.927(c)(2)(i)-(ii).

The ALJ may discredit treating-doctor opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings. See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). On the other hand, the ALJ may give more weight to doctors, nonexamining or otherwise, who testify because they have been subject to cross-examination. See Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

### 2.   Relevant facts

Plaintiff was hospitalized and diagnosed with lupus in October 2005. (AR 579.) In March 2006 he had "some joint pains," which improved with medication, but no synovitis, skin lesions, or other symptoms indicating active lupus. (AR 774, 795, 806-87.) In September 2006 Plaintiff's rheumatologist noted that his "pain and stiffness of joints has markedly improved since on prednisone" and "[t]here is no evidence of synovitis of small and large joints of upper and lower extremeties on either side." (AR 858.) By the end of 2006, however, Plaintiff's symptoms began to worsen.

Plaintiff was hospitalized in November 2007 because of complications from "severe" lupus, including a history of pancytopenia, focal renal glomerulonephritis, severe subacute dermatitis, organic brain syndrome with cognitive defects,

9

generalized skin leukocytoclastic vasculitis, polyarthritis, polymyositis, and polyneuritis. (AR 563.) In December 2007, apparently while he was hospitalized, Plaintiff also had a stroke. (AR 929.)

In February 2008, Plaintiff had a "dramatically beneficial effect" from receiving two monthly doses of Cytoxan. (AR 338-39.) His hyperuricemia and hypertension were under control, decubitus on his thoracic spine and skin were almost totally healed, and his bleeding internal hemorrhoids were resolved. (Id.) His doctor, rheumatologist Dr. Richard Hollcraft, noted that he "has been very active and running around a lot." (AR 338.) On March 19, 2008, Dr. Hollcraft noted that Plaintiff's lupus, focal membranous glomerular nephritis, polyarthritis, polymyositis, and polyneuritis were resolved and in remission. (AR 379-80.) Plaintiff also reported to his doctors that his symptoms had significantly improved; in April 2008, he stated that he was doing well, had few active symptoms, and had good energy levels. (AR 501-02.) Dr. Hollcraft noted at that time that Plaintiff was "doing extremely well and almost all other symptoms have disappeared completely." (AR 501.) The record does not contain any rheumatology treatment notes from April 2008 to September 2009, so Plaintiff presumably did not seek treatment during that time. In September and October 2009, Plaintiff's new rheumatologist, Dr. Paul Sussman, who apparently took over Plaintiff's case after Dr. Hollcraft retired (AR 584), described Plaintiff's lupus as "quiescent." (AR 927-31.) In December 2009, Plaintiff reported that he was "stable" and had had "no lupus flares." (AR 925.)

10

On November 18, 2009, Dr. Sussman filled out a check-box RFC Questionnaire.  (AR 750-56.)  He indicated that he had first seen Plaintiff on September 30, 2009.  (AR 750.)  He circled "Yes" when asked if Plaintiff "fulfill[ed] the diagnostic criteria for systemic lupus erythematosus (SLE)" and wrote that Plaintiff also had "Autoimmune hepatitis" and "CVA."  (Id.)  He then checked boxes indicating that Plaintiff had "Malar rash (over the cheeks)," "Photosensitivity," and "Oral ulcers," and he wrote that Plaintiff had pain in the hands and hips.  (AR 750.)  He also checked boxes indicating that Plaintiff had "Cardiopulmonary involvement," "Renal involvement," "Central nervous system involvement," "Positive LE cell preparation or anti-DNA or anti-Sm anti-body or false positive serum test for syphilis known to be positive for at least six months," and "Positive test for ANA at any point in time."  (AR 751.)  He further checked boxes indicating that Plaintiff had "Gastrointestinal complaints with diarrhea or constipation" and "severe" fatigue, weight loss, fever, and malaise, as well as "Muscle weakness," "Poor sleep," "Peripheral neuropathy," and "Raynaud's phenomenon."  (Id.)  He indicated that Plaintiff was not a malingerer, "emotional factors" contributed to the severity of Plaintiff's symptoms, and Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations described in the evaluation." (AR 752.)  He stated that Plaintiff's symptoms would "constantly" interfere with his ability to concentrate but that Plaintiff was "capable of low stress jobs."  (Id.)  He stated that Plaintiff could walk one city block before needing to rest; could sit or stand 10 minutes at a time before needing to change positions;

11

could sit, stand, or walk for less than two hours total in an eight-hour workday; and would need to take 30- to 60-minute rest breaks "often" throughout the workday. (AR 753.) Plaintiff could never lift or carry even 10 pounds; could never twist, stoop, crouch, climb ladders, or climb stairs; and would have "significant limitations in doing repetitive reaching, handling, or fingering." (AR 754.) He further stated that Plaintiff must avoid all exposure to extreme cold and concentrated exposure to other environmental factors such as extreme heat, gases, and chemicals. (AR 755.) He also stated that Plaintiff would likely be absent from work "[m]ore than four days per month." (Id.)

At the hearing, the ME, Dr. Gerber, testified that based on his review of the medical record, between September 2007 and March 2008, Plaintiff likely would have met Listing 14.02 (systemic lupus erythematosus)[8] and thus would have been

---

[8]To meet Listing 14.02, a claimant must produce objective medical evidence of a diagnosis of SLE, with:

A. Involvement of two or more organs/body systems, with:

    1. One of the organs/body systems involved to at least a moderate level of severity; and

    2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1. Limitation of activities of daily living.

disabled, but since March 2008 Plaintiff's symptoms were in remission and "the record supports ability to perform the full range of light level of activity with no prolonged exposure to sunlight." (AR 57.) Dr. Gerber testified that he based his conclusion on several indications in the record that Plaintiff's lupus was in remission and there were "no symptoms" documented. (AR 58 (citing AR 377, 467, 576).) He also testified that Plaintiff's hypernatremia and associated "fatigue and confusion" "[did] not appear to be a chronic condition" but instead "an acute condition that was treated." (AR 59.) He further testified that to the extent Plaintiff alleged that he had hepatitis, the record did not show any abnormalities in liver function (AR 60); Plaintiff's "mild neuropathy" did not appear to affect his ability to stand or walk (AR 60-61); and there was no "consistent documentation of very noteworthy fatigue" in the record (AR 62). When questioned about Dr. Sussman's RFC questionnaire, Dr. Gerber noted that it did not appear to be based on "any physical examination or laboratory results." (AR 64.)

The ALJ found that Dr. Gerber, although he "did not have access to the exhibits that were submitted after the hearing (Exhibits 27-30)," had "the majority of the medical record, including the claimant's testimony," and thus his opinion was

---

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § 404, Subpart P, App. 1, 14.02.

13

entitled to "great weight." (AR 17.) The ALJ also found that Exhibits 27-30, the new treatment notes from Dr. Sussman dated September to December 2009, "do not include any evidence that indicates that the claimant's condition worsened after January 2009." (Id.) He further found that Dr. Gerber's opinion that Plaintiff "could perform a full range of light work without prolonged exposure to sunlight" was consistent with the state agency medical consultants' opinions and with "the longitudinal record," and thus it was entitled to "controlling weight." (AR 22.)

As to Dr. Sussman's opinions, the ALJ made the following findings:

> Dr. Sussman began treating the claimant on September 30, 2009 and opined on November 18, 2009 that the claimant was capable of low stress jobs, that he could stand, walk, and/or sit for less than two hours in an eight-hour workday, that he must be able to shift between sitting, standing, and walking, that he requires unscheduled breaks of between 30-60 minutes, that he must avoid all exposure to extreme temperatures or hazards, that he must avoid concentrated exposure to environmental irritants, and that he will likely be absent more than four days per month due to health-related issues [(AR 750-56)]. I give this opinion less weight. First, the record does not indicate the frequency of the claimant's visits to Dr. Sussman during the two-month period between when Dr. Sussman began treating the claimant and when he offered this opinion. Secondly, the record does not

14

indicate Dr. Sussman's specialization and it is therefore
difficult to weigh his relative expertise.   Finally,
these extreme limitations are not supported by the
extensive objective evidence.

(AR 22.)

### 3.   Analysis

Plaintiff argues that the ALJ improperly discounted Dr.
Sussman's opinion.  (J. Stip. at 5-7.)  As an initial matter, Dr.
Sussman did not opine that Plaintiff was unable to work; rather,
he found that Plaintiff was "[c]apable of low stress jobs."  (AR
752.)   But to the extent that Dr. Sussman's RFC Questionnaire
failed to recognize the improvement in Plaintiff's symptoms after
March 2008[9] (see AR 338-39, 379-80, 457-58, 471-72, 501-02, 503-
04, 579-83, 584-86), which Dr. Sussman himself explicitly
recognized in his treatment notes (see AR 925-31 (repeatedly
referring to Plaintiff's lupus as "currently quiescent" and
noting that Plaintiff reported feeling well and having no acute
symptoms)), it was appropriate for the ALJ to discount it on that
basis.   See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.
2005) (ALJ may reject treating physician's assessment of
plaintiff's limitations when physician's notes and other recorded
observations contradict assessment).   Dr. Sussman's conclusion
that Plaintiff would likely be absent for health-related reasons
more than four days a month also conflicted with Plaintiff's own

---

[9]To establish eligibility for SSI benefits, Plaintiff must
show that he was disabled on or after the date of his SSI
application, March 12, 2008.  (AR 168); see 20 C.F.R. §§ 416.330,
416.335.

testimony that in the past year he had had only three lupus-related "flare ups" and had spent no more than four hours in the hospital each time before he was discharged. (AR 52.) Moreover, the ALJ's findings that Plaintiff could not sit, stand, or walk for more than 10 minutes at a time and could "never" lift even 10 pounds (AR 753-54) conflict with Plaintiff's testimony that he could sit, stand, and walk at least 15 minutes at a time, longer with his medication, and he could lift at least 20 pounds (AR 51). Dr. Sussman's finding that Plaintiff suffered from "severe" "weight loss" (AR 750) is also belied by the record, which shows that Plaintiff gained significant weight as a result of taking Prednisone (see AR 47, 735) and then lost 23 pounds when his dosage was reduced (AR 46). The ALJ was also entitled to reject the RFC Questionnaire because it was in a check-box form, did not appear to be based on any objective medical findings or an examination, and was filled out after Dr. Sussman had seen Plaintiff only two times in little over a month. See Batson, 359 F.3d at 1195 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."); Thomas, 278 F.3d at 957; cf. 20 C.F.R. § 416.927(c)(2) (treating source opinion entitled to greater weight "[w]hen the treating source has seen [claimant] a number of times and long enough to have obtained a longitudinal picture of [claimant's] impairment").

Plaintiff also asserts that to the extent the ALJ was unsure whether Dr. Sussman was indeed a rheumatologist, he had a duty to recontact him and expand the record. (J. Stip. at 21.) The ALJ

did not discount Dr. Sussman's opinion solely because he did not know whether Dr. Sussman was a rheumatologist, however – he discounted it primarily because it was drastically inconsistent with the other evidence of record, and he gave specific and legitimate reasons why.  Thus, any error the ALJ made in failing to recognize that Dr. Sussman was a rheumatologist was harmless and does not require reversal.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

Plaintiff also faults the ALJ for giving "controlling weight" to the ME's testimony because the ME, Dr. Gerber, was not a rheumatologist and "only reviewed 'the majority of the medical record'" without having access to "key rheumatology treatment records" from Dr. Sussman dated September 30, 2009, October 14, 2009, and December 9, 2009.  (J. Stip. at 5-6.)  Plaintiff similarly argues that the ALJ erred in relying on the state agency medical consultant's opinion that Plaintiff was capable of performing light work as of April 2008 (AR 441-45) because "[t]he medical consultant was not privy to medical records after that date, and as such, his assessment that Mr. Nuñez was capable of light work on April 18, 2008, does not mean Mr. Nuñez was capable of light work after that date."  (J. Stip. at 6.)  Plaintiff also argues that Dr. Gerber's assessment was unreliable because he "admitted that he had never treated anyone for lupus."  (J. Stip. at 5-6.)

First, as previously discussed, Dr. Sussman's September and October 2009 treatment notes – representing the only times Dr. Sussman saw Plaintiff before filling out the RFC Questionnaire –

17

were inconsistent with that questionnaire and consistent with Dr.
Gerber's testimony that Plaintiff's lupus was in remission and he
currently was suffering no acute symptoms.  (See AR 927-31.)
Moreover, the ALJ did not err in giving Dr. Gerber's opinion
"controlling weight" because, as the ALJ correctly noted, it was
"consistent with the longitudinal record."  (AR 22.)  Further,
because Dr. Gerber testified at the hearing and was subject to
cross-examination, the ALJ was entitled to give even more weight
to his opinion.  Andrews, 53 F.3d at 1042.  Moreover, there was
ample evidence in the record from several doctors, including
Plaintiff's treating rheumatologists, that Plaintiff's lupus was
in remission as of March 2008 and remained so until at least the
time of the hearing in December 2009.  (See AR 338-39, 379-80,
457-58, 471-72, 501-02, 503-04, 579-83, 584-86, 925-31.)  The ALJ
thus properly relied on Dr. Gerber's testimony.  He also properly
relied on the medical consultant's RFC analysis because the
evidence showed that Plaintiff's symptoms remained in remission
between the time the medical consultant evaluated Plaintiff, in
April 2008, and the time of the hearing, December 2009.  (See
id.)  Reversal is therefore not warranted on this basis.  See
Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)
(opinion of nonexamining medical expert "may constitute
substantial evidence when it is consistent with other independent
evidence in the record").

        Plaintiff further argues that the ALJ erred in not making
in-depth findings as to the limiting effects of the following
impairments: autoimmune hepatitis, polyneuropathy, fatigue,
severe urinary frequency, back pain, numbness, chronic

hyponatremia, chronic anemia, lupus nephritis, and history of
skin ulcerations including cellulitis.  (J. Stip. at 4-5.)  In
determining a claimant's RFC, an ALJ must consider the
"limitations and restrictions" imposed by all of the claimant's
impairments.  SSR 96-8p, 1996 WL 374184, at *5.  "An ALJ is not
required to discuss all the evidence presented in a case, but
must explain why he chooses to discount 'significant probative
evidence.'"  Houghton v. Comm'r, Soc. Sec. Admin., No. 11-35623,
___ F. App'x ___, 2012 WL 3298201, at *1 (9th Cir. Aug. 14, 2012)
(quoting Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir.
1984)).

Here, the ALJ properly found that there was no significant
probative evidence underlying Plaintiff's claims that his
functional capacity was significantly limited by autoimmune
hepatitis, polyneuropathy, or fatigue (AR 17); thus, the ALJ did
not err in failing to further address those claims.  Although Dr.
Sussman noted in his RFC Questionnaire that Plaintiff had
"autoimmune hepatitis" (AR 750), Dr. Gerber testified that there
was no evidence of "active clinically significant" hepatitis in
the record such as "abnormal liver function studies and if severe
enough liver biopsy," and thus to the extent Plaintiff had
hepatitis, it did not limit his ability to work.  (AR 60.)
Plaintiff does not point to any evidence of abnormal liver
functioning, and indeed, the record does not appear to contain
any.  Dr. Gerber also noted that Plaintiff was diagnosed with
"mild neuropathy" in February 2007, but the neurologic
examinations did not show any significant impairment of
Plaintiff's motor functions.  (AR 61; see AR 534-35.)  Plaintiff

1  again does not point to any evidence to the contrary.

2     With respect to Plaintiff's claims of fatigue, the ALJ found
3  that there was "no documentation of fatigue after March 2008."
4  (AR 17.)  But in October 2008 and January 2009, Dr. Howard Young
5  noted that Plaintiff had "fatigue . . . [p]robably due to the
6  combination of above [lupus-related] medical problems."  (AR 575,
7  577.)  To the extent the ALJ erred, however, the error was
8  harmless because there was no evidence in the record that
9  Plaintiff's ability to work was significantly limited by fatigue.
10 See Stout, 454 F.3d at 1055.  Plaintiff did not cite fatigue as a
11 debilitating condition in either his SSI application or his
12 hearing testimony.  (See AR 42-55, 187, 198, 201, 212.)  The only
13 documentation in the record that Plaintiff's fatigue limited his
14 ability to work is Dr. Sussman's RFC Questionnaire, on which he
15 checked a box next to "severe fatigue."  (AR 751.)  As explained
16 above, the ALJ properly discounted that questionnaire.  Dr.
17 Gerber noted that fatigue can be related to lupus and "[i]f
18 untreated it could be profound" but that there was no evidence in
19 the record of "very noteworthy fatigue."  (AR 62.)  He also
20 acknowledged that fatigue could be a side effect of the narcotic
21 medications that Plaintiff had been prescribed, but the doses he
22 was prescribed "don't seem to be very high," and there was no
23 evidence of severe fatigue in the record as a result of taking
24 them.  (AR 62-63.)  Plaintiff has not pointed to any evidence to
25 the contrary.  Thus, the ALJ did not err in not further
26 discussing Plaintiff's fatigue.

27     Similarly, Plaintiff provided no objective evidence of his
28 claims of urinary frequency, back pain, or numbness other than

his own self-serving statements.  As discussed below, the ALJ

properly rejected Plaintiff's subjective symptom testimony.  In

the absence of objective medical evidence supporting these

claims, he was not required to further address them.  See Hopkins

v. Astrue, 227 F. App'x 656, 657 (9th Cir. 2007) ("The ALJ was

not obligated to consider Hopkins's claim that his medication

made him drowsy because Hopkins provided no evidence to support

this claim other than a statement in his daily activities

questionnaire." (citing Nyman v. Heckler, 779 F.2d 528, 531 (9th

Cir. 1985) ("[A] claimant's self-serving statements may be

disregarded to the extent they are unsupported by objective

findings.")); see also Johnson v. Shalala, 60 F.3d 1428, 1432

(9th Cir. 1995) (claimant has burden to produce evidence

regarding claimed disability).  There was also no significant

evidence in the record that Plaintiff's ability to work was

impaired by chronic hyponatremia, chronic anemia, lupus

nephritis, or skin ulcerations; indeed, the record showed that

these conditions were healed or well-controlled with medication

by March 2008 and remained under control from 2008 through the

time of the hearing (see AR 338-39, 379-80, 471-72, 584-86, 923-

24), and thus the ALJ was not required to discuss them.  See

Houghton, 2012 WL 3298201, at *1 (holding that ALJ "was not

required to discuss" plaintiff's alleged limitations "arising

from depression, a heart condition, sleep apnea, a right heel

injury, diabetes with neuropathy in the right leg, or obesity"

"in the absence of significant probative evidence that they had

some functional impact on [plaintiff's] ability to work").

     The Court must consider the ALJ's decision in the context of

1   "the entire record as a whole," and if the "evidence is
2   susceptible to more than one rational interpretation, the ALJ's
3   decision should be upheld."   Ryan v. Comm'r of Soc. Sec., 528
4   F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks
5   omitted).   Plaintiff selectively points out places in the
6   treatment notes where he complained of various ailments (see J.
7   Stip. at 7-9), but read in the context of the record as a whole,
8   Plaintiff's symptoms clearly were controlled with medication and
9   his health had dramatically improved by March 2008; the ALJ
10  reasonably found that Plaintiff's limitations did not prevent him
11  from being able to work.   Reversal is therefore not warranted on
12  this basis.

13      B.   The ALJ Did Not Err in Evaluating Plaintiff's Mental
14           Impairments

15       Plaintiff argues that the ALJ erred in rejecting the
16  psychological evaluation of Dr. Gale Schuler in favor of the
17  evaluations performed by consultative evaluator Dr. Rosa Colonna.
18  (J. Stip. at 7-9.)   Reversal is not warranted on this basis.

19           1.   Relevant facts

20       Plaintiff was initially examined by consultative
21  psychological examiner Dr. Colonna on August 8, 2008.   (AR 506-
22  10.)   She administered the following five tests: Complete
23  Psychological Evaluation; Bender Visual Motor Gestalt Test –
24  second edition ("Bender Gestalt 2"); Trail Making Test, Parts A
25  and B; Wechsler Adult Intelligence Scale, third edition ("WAIS-
26  III"); and Weschler Memory Scale, third edition ("WMS-III").   (AR
27  506.)   She noted that Plaintiff reported being "highly anxious"
28  and that his "speech is slurred and he has short term memory

loss." (AR 506-07.) She further noted that Plaintiff reported getting along "generally well with others" and was "generally pleasant and cooperative." (AR 507-08.) She determined that he had "low average" intellectual functioning; his mood was "dysthymic" and his affect was "anxious"; he had no psychotic indicators; his memory was "mildly diminished for immediate recall" but "[i]ntermediate and remote memory is intact"; his attention and concentration span were "mildly diminished"; his fund of knowledge was "fair"; and his insight and judgment were "average." (AR 508.) Based on the tests she administered, she concluded that Plaintiff's "overall cognitive ability falls within the low average range." (AR 509, 510.) She then made the following findings regarding Plaintiff's ability to work, based on her examination:

> Based on today's assessment, the claimant would be able to understand, remember and carry out short, simplistic instructions without difficulty. He presents with a moderate inability to understand, remember and carry out detailed instructions. He would be able to make simplistic work-related decisions without special supervision.

> The claimant is essentially socially appropriate with the examiner. However, in the competitive job market he presents with a mild inability to consistently interact appropriately with supervisors, coworkers and peers. The claimant does appear able to manage finances on his own behalf.

(AR 510.)

Dr. Colonna examined Plaintiff again on November 8, 2009. (AR 761-71.)  She administered the following eight tests: Complete Psychological Evaluation; Bender Gestalt 2; Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"); Rey 15-Item Memory Test, second edition; Test of Memory Malingering ("TOMM"); WAIS-III; WMS-III; and OHA Assistance Request.  (AR 765.)  She noted that Plaintiff asked her to draw the shades because the sun hurt his face, that he was "slightly anxious with dysarthric and slurred speech," and his effort was "fair to poor on psychometric testing."  (AR 765-66.)  She described his mood as "dysthymic" and his affect as "slightly labile" and noted that he had no psychotic indicators; his memory "is moderately diminished for immediate recall, intermediate and remote recall"; his "attention and concentration span are moderately diminished"; and his fund of knowledge, insight, and judgment were "fair."  (AR 768.)  She noted that the MMPI-2 test produced an "unreliable and invalid profile" because Plaintiff "probably in an attempt for [sic] cry for help, endorses items of severe psychopathology that are not evidenced at time of examination."  (AR 769.)  She concluded that Plaintiff's test results "are an underestimation of the claimant's ability at this time and are of mixed reliability and validity."  (Id.)  Based on her examination, Dr. Colonna made the following findings as to Plaintiff's ability to work:

> Based on today's assessment, the claimant would be able to understand, remember and carry out short, simplistic instructions without difficulty.  He presents with a moderate inability to understand, remember and carry out detailed instructions.  He would be able to

make simplistic work-related decisions without special
supervision.

   The claimant is generally appropriate with this
examiner. However, on a consistent basis he presents
with a mild inability to interact appropriately with
supervisors, coworkers and peers in the job market. The
claimant does appear able to manage finances on his own
behalf.

(AR 770.)

   On August 28, 2008, consultative examiner Dr. R. Tyl
performed a Mental Residual Functional Capacity Assessment. (AR
524-26.) He found that Plaintiff was "moderately limited" in his
ability to "understand and remember detailed instructions";
"ability to carry out detailed instructions"; "ability to
maintain attention and concentration for extended periods";
"ability to work in coordination with or proximity to others
without being distracted by them"; "ability to complete a normal
workday and workweek without interruptions from psychologically
based symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods"; "ability to
interact appropriately with the general public"; "ability to
accept instructions and respond appropriately to criticism from
supervisors"; "ability to get along with coworkers or peers
without distracting them or exhibiting behavioral extremes";
"ability to respond appropriately to changes in the work
setting"; and "ability to be aware of normal hazards and take
appropriate precautions." (AR 524-25.) He did not find that
Plaintiff had any limitations in any other categories. (Id.) He

25

concluded that Plaintiff was capable of "adaptation for 1-2 step tasks with limited contact with others" and "tasks within physical tolerance."  (AR 526.)

On August 14, 2009, Plaintiff was examined by Dr. Schuler, a privately retained psychological examiner.  (AR 732-48.)  She noted that Plaintiff reported feeling "depressed and frustrated" because of his medical conditions, "frequently angry and apprehensive," and "impatient and irritable."  (AR 734-35.) Based on her examination of Plaintiff, she diagnosed him with "Major Depressive Disorder, Severe Without Psychotic Features," "Anxiety Disorder Due to a General Medical Condition," and "Rule Out Dementia Due to Cerebral Vascular Complications of Systemic Lupus Erythematosus versus Long Term Effects of Chemotherapy." (AR 742.)  She assigned him a Global Assessment of Function score of 35, which "suggests some impairment in communication and major impairment in several areas, including family relations, judgment, thinking and mood."  (AR 743.)  She concluded that Plaintiff

> is totally psychiatrically disabled and has likely been
> so for the past 12 months and quite probably for a longer
> period of time.  It is medically probable that this
> disability will continue for the next 12 months and for
> a longer indeterminate period of time.  The prognosis for
> this illness is deferred to the appropriate treating
> medical doctors.

(AR 744.)  There is no evidence that Dr. Schuler ever saw Plaintiff more than once.

The ALJ provided the following analysis of the psychiatric

evidence:

> The consultative, examining psychologist, Dr. Colonna, opined in August 2008 that the claimant could understand, remember, and carry out short, simple instructions and he had a mild inability to interact consistently appropriately with supervisors, coworkers, and peers [(AR 510)]. She reached the same conclusion in November 2009 [(AR 770)]. The State Agency provided a generally consistent opinion [(AR 524-26)]. I give these opinions controlling weight as they are supported by the record as a whole.

> The private psychological evaluator opined that the claimant was, among other things, between moderately-and-markedly limited in his ability to understand and remember simple or detailed instructions and between slightly-and-moderately limited in his ability to carry out short and simple instructions or interact with the general public [(AR 732-48)]. I give this opinion less weight as it was made by a private psychologist who was apparently hired by the claimant's attorney in connection with this case and who therefore was not entirely objective. Further, these extreme limitations are not supported by the evidence, including the claimant's testimony, which does not reference difficulty interacting with others.

(AR 22.)

> 2.   <u>Analysis</u>

The ALJ did not err in his evaluation of Plaintiff's mental

27

impairments.  First, Dr. Schuler's opinion was not entitled to
any greater weight than the other opinions because Dr. Schuler
was not Plaintiff's treating physician.  See 20 C.F.R.
§ 416.927(c)(2).  Indeed, Dr. Schuler apparently saw Plaintiff
only once, whereas Dr. Colonna examined him twice.  (See AR 732-
48; AR 506-10, 761-71.)  Second, as the ALJ correctly found, Dr.
Schuler's opinion that Plaintiff was "totally psychiatrically
disabled" was inconsistent with the other evidence in the record.
Dr. Schuler opined that Plaintiff was moderately to markedly
limited in his ability to understand and remember short and
simple or detailed instructions; was slightly to moderately
limited in his ability to carry out short and simple instructions
or interact with the general public; was moderately limited in
his ability to interact with supervisors and coworkers; was
moderately to markedly limited in the ability to make simple
work-related decisions; and had major impairment in, among other
things, family relations, judgment, thinking, and mood.  (AR 731-
48.)  But Plaintiff's testimony did not reflect such severe
difficulties.  Plaintiff testified generally that he had
"problems communicating and talking and remembering certain
things" (AR 43) and that dealing with his medical condition made
him "irritable" (AR 53), but he did not testify to any
significant difficulty in interacting with others.  He testified
to getting along well with his family and helping his children
get ready for school and do their homework; there was no
indication in the record that he had "major impairment" in
"family relations" or any other type of relations.  (See AR 49-
50; see also AR 582 (noting Plaintiff was "pleasant" in

1    demeanor); AR 585 (noting Plaintiff was "alert").)  Moreover, the

2    record contains no evidence that Plaintiff suffered from any

3    severe mental disorders.  (See AR 534-35 (neurological exam

4    results showing only "mild" neuropathy).)  The hearing transcript

5    reflects that Plaintiff was able to understand the questions

6    posed to him and respond appropriately.  (See AR 42-55.)  The ALJ

7    was thus entitled to reject Dr. Schuler's opinion in favor of

8    those rendered by Drs. Colonna and Tyl because the latter two

9    were consistent with significant medical evidence in the record,

10   whereas the former was not.  See Tonapetyan, 242 F.3d at 1149.[10]

11       Plaintiff's argument that Dr. Colonna's evaluation was

12   invalid because it was short and cursory and she treated him

13   rudely during the examination (J. Stip. at 8-9) is unavailing.

14   To the extent that argument is based on Plaintiff's own self-

15   serving testimony, the ALJ was entitled to reject his testimony

16   for the reasons outlined below.  Moreover, there is no evidence

17   that Dr. Colonna relied on any invalid data.  Dr. Colonna

18   completed several tests of Plaintiff and made several

19   observations supporting her conclusions.  (AR 506-10, 761-71.)

20

21       [10]Because the ALJ gave specific and legitimate reasons for

22   rejecting Dr. Schuler's opinion that were supported by
     substantial evidence in the record, any error he made in noting

23   that Dr. Schuler's opinion was unreliable because she was
     "apparently hired by the claimant's attorney in connection wth

24   this case and . . . therefore was not entirely objective" (AR 22)
     was harmless.  See Stout, 454 F.3d at 1055; but see Matney v.

25   Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (ALJ properly
     discounted physician's opinion because "he had agreed to become

26   an advocate and assist in presenting a meaningful petition for
     Social Security benefits").  In any event, the ALJ's remark could

27   reasonably be interpreted to mean simply that Dr. Schuler was not
     a treating physician.

28

Only one test, the MMPI-2, produced an invalid result (AR 769), and that may have been the result of Plaintiff's exaggerating his symptoms, as Dr. Colonna reasonably concluded.  In any event, there is no evidence that Dr. Colonna relied on that result in reaching her ultimate conclusions, nor is there evidence that Dr. Colonna's evaluation could not have been valid without reliable MMPI-2 test results.  Finally, the record contains indicia that Dr. Colonna's evaluation of Plaintiff was more thorough than Dr. Schuler's – she saw Plaintiff twice and Dr. Schuler saw him only once, and she reviewed medical records (AR 766-67) whereas Dr. Schuler did not (AR 732) – so any complaint that Dr. Colonna's evaluation was cursory rings hollow.  The ALJ thus did not err in relying on Dr. Colonna's opinion and reversal is not warranted on that basis.

> C.   The ALJ Did Not Improperly Discount Plaintiff's
>      Subjective Symptom Testimony

Plaintiff next argues that the ALJ erred in evaluating his credibility.  (J. Stip. at 21-23, 29-31.)  Reversal is not warranted on this basis, however, because the ALJ made specific, clear findings as to Plaintiff's credibility that were consistent with the medical evidence of record.

> 1.   Applicable law

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622

F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, the ALJ must give "clear and convincing" reasons for rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  "At the same time, the ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and citation omitted).  If the ALJ's credibility finding was supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

2.    Relevant facts

In connection with his SSI application, Plaintiff alleged that he was unable to work because of "Lupus/stroke, I also have had kidney failure."  (AR 187.)  He further stated that he had "had two kidney failures," was "constantly sick," and could not "be in the sun," "be in front of the computer," or "lift anything heavy."  (Id.)  He also claimed that he could not "stand for long periods of time" (AR 198) and alleged the following regarding his daily activities:

> Have to stay out of sun because of medication and of
> oral chemo.  Have no strength to do pushup, legs are
> always tingling.  Have problem with stairs.  Face, scalp
> and arms are red from chemo.  Cant do a lot of movement
> in one day.  It will take 3 days to recover.  Cant eat on
> daily basis because of pills.  Because of stroke, speech
> and writing skills are bad.  I havent got back some
> memory.  Cant put 3 good days together.  Kidneys arent

31

> 100%.  I go to the bathroom all night.  Instead of
> calling hospital who I only see once every couple of
> months, I call my doctor whom I see monthly.

(AR 201.)  He further alleged that he had difficulty "get[ting] in and out of appointments if elevator isnt working and have to use stairs or any walks over a couple hundred yards or concentrate on thing[s] for a period of time."  (AR 212.)  He continued:

> still have problems with feeling in feet and fingers 30%
> stregth in right arm and left leg still have a problem
> with stairs or long walks cant be in sun still have
> troble watching anything or paying attention to things
> for a medium period of time lack in interest in reading
> cant work to hard without being out for a couple of days
> at home have no problem driving because im setting as
> long as im out of sun.

(Id.)

At the hearing, Plaintiff testified that he had not worked since being diagnosed with lupus in approximately 2005.  (AR 42.) He stated that without his pain medication he was "in very good pain discomfort at least 5 between 1 and 10"; his back was "in discomfort"; he could not be exposed to the sun because he had a rash on his face and head; and he could not lift "anything" because of the stroke he had in December 2007, which caused weakness in his right arm and left leg.  (AR 43.)  He also stated that he had "problems communicating and talking and remembering certain things."  (Id.)  He further testified that he had a lupus rash on his back but that it had mostly healed, though it was

32

"still sensitive," and he could only wear certain types of
material on his skin because of the sensitivity.  (AR 43-44, 46.)
He testified that the rash could be "very irritable" and he
needed to protect his skin from the sun because of it.  (AR 52.)
He stated that he was prone to infections because of the lupus
and claimed to be in pain in his back and legs during the
hearing.  (AR 45, 49.)  He also stated that he had "numbness" in
his legs for the past three years.  (Id.)  He then testified that
his pain medications made him gain weight and made his stomach
upset, but when he took his medication his pain level was a
"three."  (AR 47-48.)  He testified that "dealing with pain" from
his medical condition made him "irritable."  (AR 53.)

As to his daily activities, Plaintiff testified that he
helped his kids get ready for school, drove them to school,
picked them up from school, and helped them with their homework
in the evenings.  (AR 49-50.)  He stated that he made his own bed
but could not take out the garbage because the garbage bags were
too heavy for him to lift with six or seven people living in his
house.  (AR 50.)  He also stated that he could not use stairs
because he had trouble with his balance following his stroke, and
that he did not help with any other household chores.  (Id.)  He
stated that he could not go grocery shopping because he could not
tolerate extreme cold.  (Id.)

The transcript is unclear as to what amount of time
Plaintiff stated that he could stand and walk without his
medication, though he testified that he could stand and walk 15
minutes longer with his medication; he stated that he could sit
for at least 15 minutes at a time and could lift "roughly 20

33

pounds." (AR 51.) He testified that he had had three "flare ups" of lupus in the past year; during a flare up, he testified, he would have to go to the hospital to get an IV for "about four hours and I was done." (AR 52.) At the close of his testimony, Plaintiff asked to be excused to go to the restroom. (AR 55.)

In his written opinion, the ALJ discussed Plaintiff's testimony as follows:

> Mr. Nunez testified that he is unable to work due to: back discomfort, sensitivity to sunlight, problems with his right arm and left leg due to a stroke, difficulty communicating and with his memory, skin rashes and sensitivity, irritability, and urinary frequency. He further testified that he has gained weight as a side effect of taking Prednisone, his medications cause him stomach problems, and he cannot lift his children who are six and seven years old. Previously, Mr. Nunez stated that he had two kidney failures, he cannot be in front of a computer, he cannot lift heavy items, his legs constantly tingle, his speech and writing skills were affected by his stroke, his eyesight is decreased, and his lungs lack full capacity due to pneumonia. [(AR 186-93, 197-203, 207-14.)]

> With respect to activities of daily living, the claimant states that he is able to drive as long as he does not have sun exposure [(AR 212)], he helps to care for his children, including helping them with their homework, he cannot walk up stairs, he does not shop for groceries or perform household chores, he socializes with

34

> his family when they visit him, and he has to choose
> clothing and hats that protect him from the sun or air
> conditioning.
>
> After careful consideration of the evidence, I find
> that the claimant's medically determinable impairments
> could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements concerning
> the intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are
> inconsistent with the above residual functional capacity
> assessment.

(AR 19-20.)  After summarizing the medical evidence in the record, the ALJ made the following specific findings regarding Plaintiff's credibility:

> The claimant is not entirely credible.  Mr. Nunez
> testified that he last worked five years ago [in 2005]
> when he was diagnosed with lupus.  However, the claimant
> told his treating doctor on June 5, 2008 that he was
> experiencing greater sun exposure when traveling to and
> from work [(AR 480)].  The claimant's medical care
> provider mentioned in September 2008 that they attempted
> to reach Mr. Nunez at his work telephone number [(AR
> 578)].  This is a clear contradiction.  Moreover, a
> consultative psychologist observed in August 2008 that
> the claimant was muscularly built [(AR 506)].  This, too,
> indicates that the claimant was capable of exerting more
> physical effort than he alleges.  It is significant that
> the medical expert testified that, after March 2008, he

35

1      did not find a good correlation between the claimant's
2      subjective complaints and the objective evidence.

3           I note that the claimant alleges an onset date of
4      December 1, 1999.  There is absolutely no indication as
5      to why he chose this date when his lupus-related symptoms
6      did not begin until at least October 2005.  Similarly, it
7      is noted that the claimant has a very poor earnings
8      record, with no earnings reported in 15 of the last 20
9      years since 1990 when he was 20 years old [(AR 177-81)].
10     Yet Mr. Nunez told a private psychological evaluator that
11     he continued to work until December 2007 but this was
12     eight years after his alleged onset date and the record
13     contains no reported earnings for this year [(AR 743)].
14     Thus, it appears both that the claimant did not report
15     his earnings to the Social Security Administration and
16     that he was able to work until he was hospitalized in
17     November 2007, if not later as discussed above.  This is
18     highly significant and certainly calls the claimant's
19     credibility into question.

20 (AR 21-22.)

21           3.   Analysis

22      Reversal is not warranted based on the ALJ's alleged failure
23 to make proper credibility findings or properly consider
24 Plaintiff's subjective symptoms.  The ALJ correctly noted that
25 Plaintiff's testimony and statements in the record provided
26 inconsistent reports as to the date on which he last worked,
27 which indicated that he was not truthful as to his work history.
28 (AR 21-22.)  Plaintiff's SSI application states that he last

36

worked on "February 1, 2007." (AR 168.)  His Disability Report,
however, notes an alleged onset date of "December 1, 1999" and
further notes that in the interview Plaintiff claimed he was
disabled before his formal diagnosis "but the doctors could not
diagnose him until 2005," and "[h]e last worked in 1999 due to
his disability he could no longer work." (AR 182, 185.)  At the
hearing, Plaintiff testified that he last worked in about March
2005, when he was diagnosed with lupus. (AR 39.)  But, as the
ALJ noted, on June 5, 2008, Plaintiff told his doctor that he was
having trouble with sun exposure when traveling to and from work.
(AR 480.)  On September 18, 2008, his physician noted that a
nurse had tried to contact Plaintiff at work. (AR 578.)  In
August 2009, Plaintiff told Dr. Colonna that he last worked in
December 2007. (AR 732, 743.)  Moreover, Plaintiff's earnings
record shows that he had no reported income after the year 1999,
suggesting, as the ALJ noted, that Plaintiff had not been
truthful in reporting his earnings. (AR 177-81.)

     The ALJ properly discounted Plaintiff's credibility based on
the inconsistencies in Plaintiff's testimony and prior statements
regarding his work history.  See Light v. Soc. Sec. Admin., 119
F.3d 789, 792 (9th Cir. 1997) (as amended) (in weighing
plaintiff's credibility, ALJ may consider "inconsistencies either
in [plaintiff's] testimony or between his testimony and his
conduct"); see also Fair v. Bowen, 885 F.2d 597, 603, 604 n.5
(9th Cir. 1989) (ALJ can reject pain testimony based on
contradictions in plaintiff's testimony); Tommasetti v. Astrue,
533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may discredit
plaintiff's subjective statements using ordinary techniques of

credibility evaluation).  Moreover, to the extent Plaintiff's
testimony conflicted with the medical evidence that his lupus was
in remission and his condition was stable, the ALJ properly
discounted it.  See, e.g., 20 C.F.R. § 416.929(c)(4)(iv) (ALJ may
consider effectiveness of medication in evaluating severity and
limiting effects of an impairment); SSR 96-7p, 1996 WL 374186, at
*6 ("medical signs and laboratory findings that . . . demonstrate
worsening or improvement of the underlying medical condition . .
. may also help an adjudicator to draw appropriate inferences
about the credibility of an individual's statements");
Tonapetyan, 242 F.3d at 1148 (credibility determination based on,
among other things, plaintiff's "tendency to exaggerate" proper
when supported by "substantial evidence"); Johnson v. Shalala, 60
F.3d 1428, 1434 (9th Cir. 1995) (holding that "contradictions
between claimant's testimony and the relevant medical evidence"
provided clear and convincing reasons for ALJ to reject
plaintiff's subjective symptom testimony).

    The ALJ stated in his written opinion that Plaintiff's
alleged onset date was December 1, 1999 (AR 22); Plaintiff faults
him for not recognizing the discrepancy between the February 1,
2007 onset date noted in Plaintiff's SSI application and the
December 1, 1999 onset date noted in the Disability Report.  (J.
Stip. at 22-23.)  No error occurred.  The ALJ did not find
Plaintiff not credible simply because he determined Plaintiff
falsely alleged an onset date of December 1, 1999; rather, the
ALJ properly found that there were several inconsistencies
between Plaintiff's testimony and the evidence in the record as
to when Plaintiff actually stopped working.  (See AR 22.)  The

38

December 1, 1999 onset date was just one such example noted by the ALJ.

Plaintiff also argues that the ALJ erred in finding that Plaintiff was not being truthful because there was evidence that Plaintiff had memory impairment; thus, Plaintiff argues, any discrepancies in what Plaintiff alleged were caused by his poor memory. (J. Stip. at 30.)  Plaintiff was diagnosed with "mild" neuropathy, but there is no evidence in the record that it was a significant impairment. (See AR 534-35.)  Dr. Colonna also noted that Plaintiff had "mild" to "moderate" memory loss. (AR 506-08, 768.)  But even if Plaintiff's "mild" neuropathy or "mild" to "moderate" memory loss accounted for some of his uncertainty as to the dates when certain events occurred, nowhere in the record is there evidence that his mental functioning was so deficient that he would tell a doctor that he was still working when in fact he hadn't worked for several years or would not know the difference between events that occurred in 1999 and those that occurred around the time of the hearing, ten years later.  In fact, as noted above, the evidence showed just the opposite – that Plaintiff's mental functioning was grossly intact. (See AR 506-08, 534-35, 768; see also AR 18 (noting that Plaintiff at the hearing "was able to recite from memory a large number of prescription pain medications that he takes"); AR 582 (noting that Plaintiff "is a pleasant, nontoxic, well-hydrated, well-nourished male who is comfortably seated in no acute distress"); AR 585 (noting that Plaintiff was "awake" and "alert" and in "[n]o acute distress").)  Moreover, Plaintiff's memory problems do not account for his persistent failure to report his earnings

39

to the Social Security Administration beginning in 2000, years before his alleged onset date, which was another valid reason for the ALJ to reject Plaintiff's credibility. See Maxwell v. Astrue, No. EDCV 10-1579-CW, 2011 WL 2940701, at *6 (C.D. Cal. July 20, 2011) (holding that ALJ properly relied on inconsistencies between plaintiff's testimony regarding her work history and her reported earnings in finding plaintiff not credible).

The ALJ provided legally sufficient reasons for rejecting Plaintiff's testimony and specific examples of how Plaintiff's testimony was contradicted by the record. He thus did not materially err in assessing Plaintiff's credibility and reversal is not warranted on this basis.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: December 12, 2012

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11]This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."